UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILMAR RAMOS-GOMEZ,

    Plaintiff,

v.

REBECCA J. ADDUCCI,
MATTHEW LOPEZ,
DEREK KLIFMAN, and
RICHARD GROLL,

    Defendants.

Case No. 2:19-cv-13475-LJM-MJH
Honorable Laurie J. Michelson

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTION TO TRANSFER VENUE [11]**

This case is the result of a misunderstanding or intentional discrimination, depending on who you ask. Jilmar Ramos-Gomez was born in Michigan and is a United States citizen. In 2018, he was experiencing symptoms from post-traumatic stress disorder and found himself on the roof of a hospital. He was arrested by the Grand Rapids Police Department (GRPD). At the time of his arrest, he had his U.S. Passport with him as well as his tags from his service in the U.S. Marine Corps. A local news station aired a story on Ramos-Gomez's arrest. He alleges that a GRPD officer was watching the news and—having seen nothing more than Ramos-Gomez's name and his picture—contacted U.S. Immigration and Customs Enforcement (ICE). According to Ramos-Gomez, despite that he had been arrested with his passport, and despite that ICE had been forwarded an arrest log listing his place of birth as "USA," ICE decided to issue an immigration detainer. This, apparently, was because while Ramos-Gomez was still in custody on state criminal charges, an ICE officer interviewed him, and Ramos-Gomez—still experiencing mental-health issues—stated that he was a Guatemalan citizen in the United States unlawfully. Ramos-Gomez

spent three days in ICE detention before the matter was cleared up and ICE released him. He now sues, asserting that GRPD and ICE officers conspired to detain him because of his race or ethnicity.

The question now is where this case should be litigated. Ramos-Gomez filed this case here, in the Eastern District of Michigan, but Defendants believe that the case belongs in the Western District of Michigan. So they have filed a motion to transfer venue. (ECF No. 11.) The Western District is more convenient for the parties and witnesses; for that and other reasons, the Court will grant Defendants' motion.

## I.

Although the merits of the case are not now at issue, the merits inform what evidence is important and where that important evidence is located—two issues that are central to Defendants' motion. So the Court further summarizes Ramos-Gomez's allegations, his legal claims, and the evidence attached to the parties' briefs disputing venue.

### A.

Ramos-Gomez was born in Michigan and thus, is a United States citizen. (ECF No. 14, PageID.141.) He served this country in the Marine Corps, completing a tour of duty in Afghanistan. (*Id.*)

On November 21, 2018, Ramos-Gomez suffered "a mental health episode related to his post-combat" post-traumatic stress syndrome. (ECF No. 14, PageID.142.) He ended up on the roof of a hospital in Grand Rapids, Michigan. (*Id.*)

The Grand Rapids Police Department arrested Ramos-Gomez. (ECF No. 14, PageID.142.) He was brought to Kent County Correctional Facility, also in Grand Rapids, and booked on state criminal charges. (*Id.*) At the time of his arrest, Ramos-Gomez had with him a U.S. passport, his Marine Corps identification tags, and a REAL-ID-compliant driver's license. (ECF No. 14,

PageID.143.) A requirement for a REAL ID license is proof of lawful presence in the United States. *See* U.S. Department of Homeland Security, *REAL ID Frequently Asked Questions*, https://perma.cc/ZQ5T-VV5G. Further, Ramos-Gomez's license identified him as a veteran. (ECF No. 14, PageID.143.)

On the evening of November 21, the local news ran a story about Ramos-Gomez's arrest. (ECF No. 14, PageID.143.) "The story included [Ramos-Gomez's] name, which is recognizably Latino, and included his booking photo, in which [Ramos-Gomez] is recognizably Latino." (*Id.*)

Curt VanderKooi, a captain in the GRPD, was watching the news that evening. (ECF No. 14, PageID.143.) He saw the story about Ramos-Gomez and sent an email to Derek Klifman, an ICE officer stationed in Grand Rapids. (ECF No. 11, PageID.123.) (More precisely, but more of a mouthful, Klifman was a "Deportation Officer . . . employed in the Grand Rapids Sub-Office of the Detroit Field Office of Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS)." (*Id.*)) VanderKooi asked Klifman, "Could you please check his status?" (ECF No. 14, PageID.143.) Ramos-Gomez claims that VanderKooi only referred him to ICE because of his name and appearance. (ECF No. 14, PageID.143.) Or, restated, Ramos-Gomez asserts that VanderKooi contacted Klifman because of his race and ethnicity. (*Id.*)

Several things relevant to this case happened on November 23, two days after Ramos-Gomez's arrest.

For one, Klifman forwarded the email he had received from VanderKooi to another ICE officer, Matthew Lopez. Lopez held the same position as Klifman and also worked in Grand Rapids. (ECF No. 14, PageID.125.)

3

For two, someone at ICE—Ramos-Gomez suspects Klifman or Lopez—searched for information about Ramos-Gomez in government databases; the search results included Ramos-Gomez's social security number, his Michigan birthplace, and his possession of a REAL ID. (ECF No. 14, PageID.144.)

Also on November 23, Lopez went to the Kent County Correctional Facility where Ramos-Gomez was being held and conducted an interview with him. According to Ramos-Gomez, the interview was all of two minutes and, at the time, he was slated for a mental-competency review by a magistrate judge. (ECF No. 14, PageID.143.) A later-authored ICE memorandum states that during the interview, Ramos-Gomez "admitted being a foreign national illegally in the U.S." and "claimed to be born in Guatemala and be a citizen of Guatemala and Col[o]mbia." (ECF No. 16, PageID.242.) Ramos-Gomez says that he "has never set foot in Guatemala" and "is not a citizen of Guatemala." (ECF No. 14, PageID.145.)

Following his interview with Ramos-Gomez, Lopez asked a third ICE officer, Richard Groll, to issue an immigration detainer. (ECF No. 11, PageID.127–128.) (Detainers are requests by ICE to local law enforcement agencies asking that the agency notify ICE before someone is released and to continue custody for up to 48 hours to allow ICE to assume custody. U.S. Immigration and Customs Enforcement, *Detainers*, https://perma.cc/P657-YB79.) Like Lopez and Klifman, Groll was an ICE deportation officer who worked in the Grand Rapids sub-office of the Detroit Field Office. (ECF No. 11, PageID.127.) The detainer listed Ramos-Gomez as a Guatemalan citizen. (ECF No. 14, PageID.145.)

Lopez then emailed VanderKooi. Lopez stated, "I was able to interview [Ramos-Gomez] at Kent County this morning, and he is a foreign national illegally in the U.S. Thank you for the

4

lead[;] he will be coming into our custody when he is released from his criminal case. Let me or Derek [Klifman] know if you ever have any other good leads." (ECF No. 14, PageID.145–146.)

Three days later, on November 26, VanderKooi sent an email to Lopez and to Adam Baylis. Baylis was the detective in the GRPD who had been assigned to present Ramos-Gomez's charges to the state prosecutor. (ECF No. 14, PageID.146.) The subject of VanderKooi's email stated, "Spectrum Helicopter Pad Loco." (ECF No. 14, PageID.146–147.) The body of VanderKooi's email stated, "It is not clear what mad intent was involved in this breach of hospital security but here is the report." (ECF No. 14, PageID.147.) The attached police report indicated that Ramos-Gomez had been arrested with his passport. (ECF No. 14, PageID.147.)

That same day (November 26), Baylis told the state prosecutor that ICE would be taking custody of Ramos-Gomez after his release. According to Ramos-Gomez, "[t]he prosecutor responded immediately with alarm, noting [Ramos-Gomez's] status as a veteran and the fact that he was in possession of his United States passport when arrested." (ECF No. 14, PageID.147.)

Ramos-Gomez remained in custody on state charges for three weeks. On December 14, 2018, Ramos-Gomez's mother arrived at the Kent County Correctional Facility to pick him up. (ECF No. 14, PageID.148.) She learned that Ramos-Gomez had been transferred to ICE. (*See id.*) In fact, ICE was transporting Ramos-Gomez to the Calhoun County Correctional Facility, a state correctional facility that ICE contracts with to house immigration detainees. (ECF No. 14, PageID.148.)

Two days later, on December 16, ICE issued formal paperwork relating to Ramos-Gomez's detention and removal proceedings. A Supervisory Detention and Deportation Officer, perhaps one working in ICE's Detroit Field Office, issued a Notice of Custody Determination. (ECF No. 14, PageID.148.) (Ramos-Gomez does not yet know the name of this supervisory officer; so the

5

officer has been named as a Doe defendant.) The notice told Ramos-Gomez that he would be held in detention "pending a final administrative determination in [his] case." (ECF No. 16, PageID.237.) ICE also issued a Notice to Appear. (PageID.148.) That notice stated that Ramos-Gomez was to appear before an immigration judge in Detroit at a time and date to be set. (ECF No. 16, PageID.238.)

Eventually, Ramos-Gomez's attorney got word that Ramos-Gomez was in ICE custody. (ECF No. 14, PageID.150.) The attorney provided ICE with additional documentation of Ramos-Gomez's United States citizenship. (*Id.*) Upon review of this documentation, the Acting Assistant Director of ICE's Detroit Field Office ordered that Ramos-Gomez be released. (*Id.*) Ramos-Gomez was released on December 17, 2018. In all, Ramos-Gomez spent three days in ICE custody at the Calhoun County Correctional Facility. (*Id.*)

**B.**

Ramos-Gomez believes that he is not the only person that the GRPD and ICE officers in Michigan have detained based on race or ethnicity. Ramos-Gomez has obtained emails between VanderKooi and ICE officers, including Klifman and Lopez, that, according to Ramos-Gomez, further show that GRPD and ICE officers in Michigan conspired to detain or remove people based on their race or ethnicity.

More specifically, Ramos-Gomez alleges that between 2017 and 2019, Klifman, Lopez, and "other ICE agents, including ICE agents in the Detroit Field Office," exchanged emails with VanderKooi 87 times. (ECF No. 14, PageID.151.) Ramos-Gomez says that VanderKooi was the "designated and recognized" "liaison" between the GRPD and ICE. (*Id.*) Allegedly, the 87 email exchanges "were part of an agreement between members of the GRPD, [the Calhoun County Correctional Facility], and ICE to racially profile individuals, including [Ramos-Gomez], for

6

immigration enforcement, detention, and deportation." (*Id.*) These emails inquired into the immigration status of individuals and, says Ramos-Gomez, "[u]pon information and belief, all of these individuals were Latinos or members of other ethnic minorities." (*Id.*)

Ramos-Gomez details a few of the email exchanges. In one, VanderKooi forwarded Klifman a police report about a homeless person and added, "Can you look at this menace to our community? Thanks!" (ECF No. 14, PageID.152.) Klifman responded that the person was lawfully present, but if he ended up being convicted of the crime set out in the police report "he may be of interest to us." (*Id.*) Another email exchange relates to ICE's January 2017 arrest of a person of color. (ECF No. 14, PageID.152–153.) VanderKooi emailed Klifman asking about the person's immigration status and expressed skepticism that he was lawfully present. (ECF No. 14, PageID.153.) As it turned out, ICE's attorneys confirmed that he was lawfully present. (*Id.*) As a third example, Ramos-Gomez says that VanderKooi asked Klifman about an individual's immigration status, and Klifman responded that the person had an order of deportation and wrote, "☺ I'll see what I can do when you guys locate him!" (ECF No. 14, PageID.153.)

## C.

Ramos-Gomez filed this lawsuit against five individuals: ICE Deportation Officers Klifman, Lopez, and Groll, the unknown supervisory deportation officer who sent the notice of custody, and Rebecca Adducci, the Director of the Detroit Field Office (collectively, "Defendants"). (ECF No. 14, PageID.141–142.) Ramos-Gomez has not named VanderKooi, Baylis, or any other member of the GRPD as a defendant. (*See id.*) Ramos-Gomez has sued all five ICE agents in their individual capacity (ECF No. 14, PageID.141–142) and seeks compensatory and punitive damages but not injunctive relief (ECF No. 14, PageID.157).

7

Ramos-Gomez brings two legal claims against Defendants. One is under 42 U.S.C. § 1985(3). Oversimplifying slightly, that subsection of the Ku Klux Clan Act of 1871 bars two or more people from conspiring to deprive a person of equal protection of the laws. 42 U.S.C. § 1985(3). Ramos-Gomez says that Defendants entered into an agreement with "the GRPD, Captain VanderKooi, Detective Baylis, and other ICE, GRPD, and [Calhoun County Correctional Facility] officers" to target him and others for immigration enforcement based on their race or ethnicity. (ECF No. 14, PageID.155.) Ramos-Gomez's second claim is under 42 U.S.C. § 1986. And again oversimplifying a bit, that statute makes a person liable for knowing that others are violating § 1985, "having power to prevent" that violation, and failing to use "reasonable diligence" to prevent the violation. Ramos-Gomez says that Defendants knew that he was a U.S. citizen, knew that an immigration detainer had been issued, and knew that he would be taken into ICE custody upon his release from state custody, yet refused to stop the immigration detention. (ECF No. 14, PageID.156.)

## II.

Defendants seek to transfer this case to the Western District of Michigan under 28 U.S.C. § 1404(a). That statute allows a district court to transfer a case to any district court where it might have been originally filed "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). Defendants have the burden of showing that the case should be transferred to the Western District. *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 652 n.7 (6th Cir. 2016). Ramos-Gomez says that burden is "heavy" and that the balance must tip "strongly" in favor of transfer, but that is not quite right, as will be explained later.

A district court has "broad discretion" in deciding whether to transfer a case to a different venue. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009); *see also Ford Motor Co. v.*

*Ryan*, 182 F.2d 329, 331–32 (2d Cir. 1950) (providing that the very nature of the transfer inquiry forces a district judge to make a "guess" about convenience and justice, and "we should accept [her] guess unless it is too wild"). In exercising that discretion, courts often (but are by no means required to) consider the following: "the convenience of the parties and witnesses," "the availability of process to make reluctant witnesses testify," "the costs of obtaining willing witnesses," "the accessibility of evidence," and "practical problems of trying the case most expeditiously and inexpensively," and "the interests of justice." *See Reese*, 574 F.3d at 320. (Courts sometimes consider "location of operative facts" too, *see Means*, 836 F.3d at 651, but that just seems to be a proxy for determining where the evidence is located, gauging community interest, and deciding which state's law will apply and which court is more familiar with that law; rather than use a proxy, this Court prefers to address those considerations directly.) The considerations that are most important vary with the facts of the case and legal claims. *See In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009) ("The Supreme Court has long held that § 1404(a) requires individualized, case-by-case consideration of convenience and fairness."); *accord Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010).

### III.

In this case, several of the transfer factors do little to tilt the transfer-or-no-transfer scale one way or the other. The Court agrees with Ramos-Gomez that the location of the documentary evidence is largely a non-factor. (ECF No. 16, PageID.225.) Documents are easily exchanged electronically or can be shipped from anywhere. In fact, given that one of Ramos-Gomez's attorneys is in Chicago, documents will need to be transported whether the case is here or in the Western District. But, to the extent the key documents need to be made available for review, as

permitted by Federal Rule of Civil Procedure 34, that is more likely to occur in the Western District. As for the interest of justice, Ramos-Gomez argues that because the chance of presenting his case to a diverse jury is "much lower in Western District of Michigan," a transfer would "greatly" prejudice him. (ECF No. 16, PageID.231.) But Ramos-Gomez presents no evidence that the probability of obtaining a racially-diverse jury in the Western District is substantially lower than the probability of obtaining a racially-diverse jury in the Eastern District—especially in a civil case requiring only about 6-8 jurors. (*See id.*) While certain metro-Detroit cities may have greater racial and ethnic diversity than certain cities in the Western District, this District selects jurors from half the state. As for factors relating to time-to-disposition, this Court has no reason to think that it will handle the matter faster than a judge in the Western District.

In this Court's view, the considerations that weigh most heavily on the decision to transfer are the convenience of the parties, the convenience of the witnesses, and the parties' ability to compel participation of reluctant witnesses. So the Court addresses these considerations in some detail.

Start with the convenience of the parties. To be sure, Ramos-Gomez prefers to litigate this case in the Eastern District of Michigan. But in terms of pure *convenience*, the case might be better for him in the Western District: Ramos-Gomez lives there. (ECF No. 11, PageID.114.) (And for what it is worth, one of Ramos-Gomez's lawyers is in Chicago, another in Grand Rapids, and a third in Detroit; so the Western District appears to be about as convenient as the Eastern for Ramos-Gomez's counsel.) On the other side of the "v," Defendants Klifman, Lopez, and Groll all live and work in the Western District. True, Adducci works (and presumably lives) in the Eastern District. (ECF No. 16, PageID.219.) And, perhaps, that is true for Defendant Doe too. (*Id.*) But based on Ramos-Gomez's complaint, it appears that VanderKooi, Klifman, and Lopez are the ones that are

10

at the center of the alleged conspiracy. And they are clearly at the center of the specific incident involving Ramos-Gomez. And while Ramos-Gomez pleads that Adducci "oversaw the actions" of Klifman, Lopez, Groll, and Doe (ECF No. 14, PageID.141), and that she is responsible for all detainers issued by the Detroit Field Office, it appears that her supervision was indirect. Adducci avers that she manages a staff of "over 200" and that "[t]here are generally three supervisory levels" between her and ICE officers who issue detainers and make the probable cause determinations on removability. (ECF No. 11, PageID.131.) So it is quite possible that Adducci's involvement in this case will be limited. As for Doe, Ramos-Gomez merely alleges that this officer issued the notice of detention. But it was Lopez that determined Ramos-Gomez was here unlawfully and Groll who issued the detainer. So, like Adducci, Doe may have limited involvement in the litigation. On balance then, the Western District is more convenient for the parties than the Eastern.

Turning to the convenience of the witnesses, Ramos-Gomez identifies quite a few witnesses that work at the Detroit Field Office and, thus, presumably live in the Eastern District of Michigan. Aside from Adducci and Doe, Ramos-Gomez points out that the people who conducted ICE's internal investigation into his detention work in the Detroit Field Office. (ECF No. 16, PageID.219, 221.) He adds that ICE's Chief Legal Counsel and Assistant Chief Legal Counsel are in that office too, and they helped respond to document requests regarding his case. (ECF No. 16, PageID.220.) Ramos-Gomez says that the Assistant Field Office Directors who supervised Klifman and Lopez work in the Detroit Field Office. (ECF No. 16, PageID.221.) Further, Ramos-Gomez argues, ICE supervisory staff that developed the detention and removal policies are in the Detroit Field Office. (*Id.*) Ramos-Gomez also believes that the witness responsive to his Rule 30(b)(6) subpoena will be in Detroit. (ECF No. 16, PageID.224.)

11

While there are undoubtedly some witnesses that work in the Detroit Field Office, the Court is not persuaded that they are numerous or that they are the most important witnesses. According to Defendants, ICE officers are trained in Georgia, ICE policies are developed in Washington, D.C., and Klifman, Lopez, and Groll's *direct* supervisors are in Grand Rapids. (ECF No. 19, PageID.274.) So it is unlikely that there will be many ICE supervisors in the Detroit Field Office that have information that is critical to this case. As for Adducci and Doe, the Court has already explained that they may end up having a limited role in this litigation. And while legal counsel that work in the Detroit Field Office may have information helpful to Ramos-Gomez's case, there is a good chance that some of their testimony will be shielded by attorney-client privilege or the work-product doctrine.

Now consider Defendants' side of the scale. Aside from the fact that Klifman, Lopez, and Groll are in the Western District, key non-party witnesses are there too. VanderKooi, who, based on the complaint, is an important cog in the alleged conspiracy, works in the Western District. Baylis, the GRPD detective assigned to Ramos-Gomez's case, works there too. What about the witnesses that observed Ramos-Gomez's condition before his November 23 interview with Lopez and the witnesses that observed that interview (if any)? Western District. And those witnesses would be useful for assessing Ramos-Gomez's mental state at the time of his interview with Lopez, whether he in fact said he was a Guatemalan citizen, and, if he said that, whether Lopez should have taken the statement at face value given Ramos-Gomez's mental state. Further, the people that observed Ramos-Gomez's health before, during, and after ICE detention are in the Western District; those witnesses would have information relevant to damages. Indeed, Ramos-Gomez alleges that while in ICE detention, officers at the Calhoun County Correctional Facility "ridiculed and mistreated" him. (ECF No. 14, PageID.149.)

12

In short, the Western District would be more convenient for the witnesses.

Next consider the ability to compel unwilling witnesses to testify. Ramos-Gomez's counsel "has extensive experience trying cases against law enforcement officers" and says that in her experience, the witnesses in the Detroit Field Office will not voluntarily testify "unless they are witnesses Defendants want to call too." (ECF No. 16, PageID.230.) "Not surprisingly," counsel adds, "law enforcement officers tend not to go out of their way to assist plaintiffs in lawsuits against their cohort." (ECF No. 16, PageID.230.) Thus, in Ramos-Gomez's view, the Eastern District is the better forum because those in the Detroit Field Office can be compelled to appear for depositions and trial.

The Court appreciates Ramos-Gomez's concern about the limitations of compulsory process, but this consideration does not weigh against transfer. Regarding trial testimony, the Federal Rules provide, for example, "A subpoena may command a person to attend a trial, hearing, or deposition only as follows . . . *within the state* where the person resides, is employed, or regularly transacts business in person, *if the person . . . is commanded to attend a trial and would not incur substantial expense*." Fed. R. Civ. P. 45(c)(1)(B)(ii) (emphasis added.) A trip from the Detroit area to a court in the Western District (which might be as close as Lansing or Kalamazoo) is not a "substantial expense." So those in the Detroit Field Office can likely be compelled to testify at a trial in the Western District. As for depositions, a flight from counsel's Chicago location to Detroit or a drive from Grand Rapids to Detroit is pretty convenient; and if not, the Western District court can order those in the Detroit Field Office to appear anywhere within 100 miles of that office, say Lansing. *See* Fed. R. Civ. P. 45(c)(1)(A). And consider the flip side of the coin: if Ramos-Gomez has a compromised ability to compel witnesses in Detroit to testify if this case were in the Western District, then the same would be true for the many witnesses in Grand Rapids if the case

13

stays here. Notably, VanderKooi is not a party and, given the allegations against him, may be a reluctant witness.

When taken together, the three most important transfer considerations weigh in favor of transferring this case to the Western District.

In addition to the arguments already addressed, Ramos-Gomez resists this conclusion with two points of law.

For one, he says that there is "strong presumption in favor of the plaintiff's choice of forum." (ECF No. 16, PageID.230.) He chose the Eastern District. So, says Ramos-Gomez, the case should stay here unless the Western District is decidedly the better forum. (*See id.*)

There is no shortage of opinions stating that courts defer to the plaintiff's choice of forum (assuming that chosen forum is a proper one). But there is law that qualifies this rule too. In particular, where the plaintiff chooses a forum that is not his home forum, courts accord less deference to the plaintiff's choice. *See Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 651 (6th Cir. 2016) ("[A]s the district court correctly noted, where the plaintiff does not reside in the chosen forum[,] courts assign less weight to the plaintiff's choice." (internal quotation marks omitted)); 15 Arthur R. Miller, *Federal Practice and Procedure, Jurisdiction* § 3848 (4th ed.) (noting that "[i]f the plaintiff is not a resident of the forum, the plaintiff's forum choice may be entitled to relatively little deference" and citing numerous cases in support). Here, the Western District can exercise personal jurisdiction over Defendants, venue is proper there, the events giving rise to this suit primarily occurred there, and Ramos-Gomez and overwhelming majority of defendants live there. As such, the Court does not give significant weight to Ramos-Gomez's choice of forum.

Ramos-Gomez also argues that Defendants have a "'heavy'" burden of showing that transfer is proper and that the "'balance of factors weighs strongly in favor of transfer.'" (ECF No. 16, PageID.216 (quoting *Steelcase, Inc. v. Smart Techs., Inc.*, 336 F. Supp. 2d 714, 719 (W.D. Mich. 2004)).)

This Court thinks that overstates Defendants' burden. True, there is also no shortage of opinions saying that the transfer-or-no-transfer scale must tip "strongly" toward the transfer side. Indeed, the Sixth Circuit Court of Appeals has said it. *Nicol v. Koscinski*, 188 F.2d 537, 537 (6th Cir. 1951) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). But as the well-regarded Wright & Miller treatise explains, "The language that 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed' initially appeared in [*Gulf Oil*, a case] on *forum non conveniens*. In the years shortly after Section 1404(a) was enacted, at a time when many federal courts thought that the statute was merely a codification of the *forum non conveniens* doctrine, the cases quite naturally applied that language in cases arising under the new statute." 15 Arthur R. Miller, *Federal Practice and Procedure, Jurisdiction* § 3848 (4th ed.). But after *Gulf Oil*, the Supreme Court clarified that "transfers can be granted under Section 1404(a) more freely than dismissals under *forum non conveniens*." *Id.* To be more specific, in *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955), the Supreme Court explained, "The harshest result of the application of the old doctrine of *forum non conveniens*, dismissal of the action, was eliminated by the provision in § 1404(a) for transfer. When the harshest part of the doctrine is excised by statute, it can hardly be called mere codification. As a consequence, we believe that Congress, by the term 'for the convenience of parties and witnesses, in the interest of justice,' intended to permit courts to grant transfers upon a lesser showing of inconvenience." Unfortunately, by the time *Norwood* clarified matters, "decisions requiring the balance to be 'strongly' in favor of the moving

15

party for transfer had acquired a momentum of their own. Many courts later cited and quoted those cases without recognizing that the original source of the theory was *forum non conveniens* doctrine, and that application of this standard to Section 1404(a) is doubtful." Miller, *supra*, § 3848. Indeed, the Sixth Circuit's *Nicol* decision was before *Norwood*. Thus, this Court does not believe that Defendants must show that the considerations "strongly" favor a transfer. *See Roberts Metals, Inc. v. Fla. Properties Mktg. Grp., Inc.*, 138 F.R.D. 89, 92–93 (N.D. Ohio 1991) (declining to follow *Nicol* because it is a pre-*Norwood* decision).

And, in any event, the Court has found that the heaviest weights on the transfer scale—the convenience of the parties, the convenience of the witnesses, and the ability to compel the participation of witness—collectively "strongly" favor transfer.

## IV.

For the reasons given, the Court GRANTS Defendants motion to transfer venue (ECF No. 11). Pursuant to 28 U.S.C. § 1404(a), this Court ORDERS the Clerk of Court to transfer this case to the Western District of Michigan.

SO ORDERED.

Dated: October 8, 2020

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES DISTRICT JUDGE